UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

**FILED**

**JUL 3 1 2013**

CLERK

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

LUTHER A. EVERSON

Plaintiff,

-vs-

CAROLYN W. COLVIN,[1]
Commissioner of Social Security,

Defendant.

*
*
*
*
*
*
*
*
*
*
*
*
*
*

CIV. 12-4114

REPORT and RECOMMENDATION

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Plaintiff, Luther A. Everson ("Everson") seeks judicial review of the Commissioner's final decision denying him a period of disability commencing on February 13, 2008, and payment of disability insurance and medical benefits under Title II and/or Title XVI of the Social Security Act.[2] Everson has filed a Complaint and has requested the Court to enter an order instructing the Commissioner to award benefits. Alternatively, Everson requests a remand to the agency pursuant to 42 U.S.C. § 405(g) sentence four, for further consideration. The matter is fully briefed and has been referred to the Magistrate Judge for a Report and Recommendation. For the reasons more fully

---

[1]Carolyn W. Colvin became the acting Commissioner of Social Security on February 14, 2013.

[2]SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits are sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference –greatly simplified–is that a claimant's entitlement to SSD/DIB benefits is dependent upon his "coverage" status (calculated according to his earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.

In this case, Everson filed his application for both SSD/DIB and SSI benefits. He protectively filed his application for both types of benefits on January 15, 2009. AR 195-210. Everson's "date last insured" for SSD/DIB ("Title II") benefits is March 31, 2013. *See* AR 320.

explained below, it is respectfully recommended to the District Court that the Commissioner's Decision be REVERSED AND REMANDED for further consideration consistent with this opinion.

## JURISDICTION

This appeal of the Commissioner's final decision denying benefits is properly before the District Court pursuant to 42 U.S.C. § 405(g). Judge Piersol referred this matter to the Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and Judge Schreier's Standing Order dated March 18, 2010.

## ADMINISTRATIVE PROCEEDINGS

Everson protectively filed his application for benefits on January 15, 2009.[3] AR 195-210. In a form entitled "Disability Report–Adult" he filed in connection with his 2009 disability application (AR 243-258) Everson listed the following as illnesses, injuries or conditions that limited his ability to work: "2 whiplash injuries in the last 2 ½ years on top of other back injuries, chronic fatigue syndrome, anxiety disorder, get dizzy when I drive, I also have bursitis in my right knee." AR 244. He explained that these conditions limit his ability to work in the following ways: "I can't stand up for very long periods and if I do I can't work the next day or 2." *Id.*

Everson's claim was denied initially on June 5, 2009 (AR 121-123), and on reconsideration on November 20, 2009 (AR 134-135). He requested a hearing (AR 139-140) and a hearing was held on October 25, 2010, before Administrative Law Judge (ALJ) the Honorable Marsha Stroup. AR 54-84. On November 22, 2010, the ALJ issued a ten page, single-spaced decision affirming the previous denials. AR 27-36. On December 8, 2010, Everson's representative[4] requested a review of the ALJ's decision by the Appeals Council. AR 19-20. The Appeals Council received as additional evidence: a brief submitted by his representative (AR 193-194). The Appeals Council

---

[3]The protective filing date is the date a claimant first contacts the Social Security Administration about filing for benefits. It may be used to establish an earlier application date than when the Administration receives the signed application. *See* http://www.ssa.gov/glossary.htm.

[4]Plaintiff was not represented by Mr. Pfeiffer at the administrative level.

denied review of Everson's claim on May 15, 2012. Everson then filed a Complaint in this Court.

## FACTUAL BACKGROUND

Luther Everson was born in 1956 and was fifty-three years old at the time of the administrative hearing. AR 58.[5] He graduated from high school . AR 58. He attended college for two years, then dropped out and went to barber's school. AR 59. He was a barber for twenty-nine years. *Id.*

Everson was involved in an automobile accident in February, 2008. AR 59. He as unable to work until November. In November he returned to work part-time until January, 2009. *Id.* Everson is divorced and has one child. *Id.* He lives in a government subsidized apartment. AR 60.

### Medical Conditions and Treatment

The medical records which appear in the administrative records are summarized by provider.

### 1.    Commonwealth Internal Medicine, Richmond, VA (Dr. McLeod) 10/05-8/09

Everson visited Dr. McLeod for the first time on October 31, 2005. Everson had multiple concerns. AR 437. Everson told Dr. McLeod about a twenty year history of anxiety treated with Xanax, most recently at a dosage of 1 mg three times daily. Everson described an intolerance to Prozac and Elavil. He explained Prozac caused him to have suicidal ideations and Elavil caused dry mouth and eyes. Everson described nervousness, agoraphobia and anxiety while driving. He also described chronic fatigue syndrome which he believed began around the time of his father's death, although an "extensive workup" eight years prior for chronic fatigue was negative. AR 437. Dr. McLeod noted Everson was referred to this clinic by his chiropractor, Dr. Purvis.    Dr. McLeod decided to try Everson on Paxil and referred him to a psychiatrist. AR 438.

On follow up with Dr. McLeod in June, 2006, Everson reported he only took the Paxil for about one week. He did not believe it worked. AR 436. He continued to take Xanax three times

---

[5]Pursuant to 20 C.F.R. Pt. 404 Subpt. P. App. 2, Medical Vocational Guidelines, § 201.00(g), Everson was "approaching advanced age" (50-54) on the date of his administrative hearing, and the date of his alleged onset.

a day. At this time, Everson had just started a new job selling furniture. *Id.* Everson returned in March, 2007 complaining of back pain. Dr. McLeod prescribed Flexeril.[6] Dr. McLeod noted that Everson left his job with the furniture store and had not worked at all in the last few months. AR 434. Dr. McLeod advised Everson to try Aleve[7] but did prescribe a Medrol Dosepak.[8] Dr. McLeod also advised Everson to start a walking program and lumbar exercises.

Everson returned to Dr. McLeod on November 9, 2007. He was doing well and his low back was doing much better. AR 432. He had returned to cutting hair and was doing "fine" with his chronic anxiety, although still taking Xanax three times per day. *Id.* Everson saw Dr. McLeod again in February, 2008, eight days after Everson was involved in a rear-end car accident. AR 430. Everson reported neck pain. Everson told Dr. McLeod he'd visited a chiropractor immediately after the accident but had not gotten any relief. *Id.* Dr. McLeod scheduled an MRI and prescribed a Medrol Dosepak, Voltaren[9], and Flexeril. Everson followed up with Dr. McLeod in June, 2008 to discuss the MRI findings. AR 427. The MRI showed "significant arthritis." Everson told Dr. McLeod he could not afford the physical therapy that was recommended because he did not have any health insurance. *Id.* By this time, Everson had lost his job as a hairstylist. *Id.* Dr. McLeod observed that Everson was "a little depressed" but in no acute distress. *Id.* The objective exam revealed reduced range of motion in the neck and fine tremors in both outreached hands. *Id.* Dr. McLeod referred Everson to an orthopedist.

---

[6]Flexeril is indicated for the relief of muscle spasm associated with acute, painful musculoskeletal conditions. www.rxlist.com

[7]Aleve is an over-the-counter pain reliever. It contains naproxen sodium and is recommended for the temporary relief of minor arthritis pain, muscle aches, headaches, and back aches. www.aleve.com.faqs

[8]A Medrol Dosepak is a steroid that prevents the release of substances in the body that cause inflammation. Www.drugs.com/mtm/medrol-dosepak

[9]Voltaren is a benzene-acetic acid derivative. It is indicated for relief of the signs and symptoms of osteoarthritis, rheumatoid arthritis, and ankylosing spondylitis. www.rxlist.com

Everson returned to see Dr. McLeod in February, 2009. Everson continued to take Aleve in the mornings and Flexeril at night. Everson reported that he tried to return to work but whenever he worked a full day, he was out for two days because of pain and stiffness. AR 426. He reported chronic fatigue with "mental fog." He continued to use Xanax three times per day. He reported doing some "light" weight lifting and using his Gazelle[10] machine every other day for twenty-five or thirty minutes. Dr. McLeod also encouraged him to try a half hour of aerobics daily. AR 426.

Everson saw Dr. McLeod again on August 5, 2009. AR 449. McLeod noted Everson "has had fibromyalgia for at least 16 years." *Id.* Dr. McLeod noted anxiety and depression. He asked Everson to see a rheumatologist for consultation because Dr. McLeod was "uncomfortable certifying [Everson] is disabled for life. I am not sure he has exhausted all possible treatments. I certainly recommend he start a regular aerobics exercise program starting very gradually. He will continue his medications as prescribed. He will consider psychiatric consultation. I have given him the name of Dr. George Moxley down at MVC, Rheumatology, but he is going to see if he can see one through the free clinic, which seems reasonable. . . ." AR 449.

## 2.    Purvis Chiropractic Clinic (Lillian Purvis, DC) 9/05-11/06

The first record from Purvis Chiropractic is dated September 7, 2005. AR 347. Unfortunately, the records from this provider are very unenlightening. The only things that are apparent to a non-chiropractor from the records are that Everson's chief complaint was "neck pain" and that he was a "cash patient." *Id.* Everson continued to treat at the clinic through October, 2006 but the records are for the most part illegible. AR 348-349. In November, 2006 Dr. Purvis wrote a letter to a claims adjuster[11] explaining the treatment provided to Everson by the clinic: Everson complained of lower back and neck pain. AR 350. Examination revealed muscle spasms bilaterally at C4-C7 and T4-T7 and L5-S1. Cervical range of motion was within normal limits. Lumbar range of motion was restricted and painful. Straight leg test was positive on the left. X-rays showed

---

[10]A Gazelle® machine is an elliptical glider type exercise machine. www.gazelleglider.com

[11]Everson's chiropractic care at the Purvis Clinic was provided after a rear-end automobile accident which occurred in the fall of 2006. AR 350.

"rotational malpositions at L3-L5 lumbar regions and C5/C6 IVF encroachment, lipping and spurring." AR 351. Dr. Purvis diagnosed rotational malpositions of the pelvis and L5 lumbar spine, complicated by neuralgia and sciatica and associated with muscle spasms, with secondary subluxation of C5/C6 complicated by dizziness associated with cervical strain and muscular contracture. AR 351. Dr. Purvis noted that because Everson had been diagnosed with chronic fatigue syndrome in 1993 he (Everson) believed his recovery would be slow. The note indicated the chiropractor recommended an MRI scan of the head and lumbar area but Everson decided to obtain a second opinion. AR 351.

### 3. Capital Chiropractic Center, 11/06-4/07

There are clinic records in the administrative record from this provider spanning the above dates. AR 353-364. They are of no assistance in this proceeding, however because they are illegible and incomprehensible.

### 4. Tauer Chiropractic Center, 2/08-4/08

Everson presented at Tauer Chiropractic for the first time on February 13, 2008. AR 366. He reported a whiplash injury from a rear end collision, along with shoulder and back pain. *Id.* He indicated he had pain with standing and that he got 'whoozy" bending over. His pain interfered with work, sleep, and his hobbies. He was then taking Xanax for anxiety. He reported his neck was very stiff, tight and painful and that he had headaches and felt light headed. He also reported ringing in his ears. AR 367. He also reported mid-back muscle spasms "on and off." *Id.* The records for Everson's visits after the initial visit are illegible. AR 369.

### 5. Tuckahoe Orthopaedic Associates–(Dr. Seeman),4/08-10/08

Everson presented to the Tuckahoe Orthopaedic Clinic after having been referred by Dr. McLeod. AR 374. He reported pain in the cervical spine. He also reported numbness and pain in both arms. Everson was then taking Flexeril, Voltaren and Xanax. *Id.* He reported trouble sleeping, depression, anxiety, weakness, cramps, ringing in the ears, headaches, numbness, memory loss, and blurred vision. Dr. Seeman observed that x-rays revealed facet joint arthrosis at C2-3, C3-4, C4-5 and C5-6, and decreased disc heights at C3-4, C4-5, C4-5 and C5-6. The MRI showed cervical

degenerative spondylosis with narrowing of the ventral subarachnoid space, greater on the right and right neuroforamen at C3-4. AR 374. Dr. Seeman diagnosed mechanical cervical pain secondary to cervical facet joint mediated pain. AR 375. He planned physical therapy and possible surgical intervention. *Id.* Everson returned on May 27, 2008. He told Dr. Seeman he did not follow through with physical therapy because he could not afford it. AR 376. Dr. Seeman reiterated the need for physical therapy and told Everson he would attempt to help him obtain some financial assistance. Dr. Seeman gave Everson free samples of Voltaren. *Id.*

Everson returned to Dr. Seeman on August 26, 2008. AR 377. By then Everson had been in physical therapy for eight weeks. Everson reported improvement until he pushed too hard in therapy. Dr. Seeman changed Everson's medication from Flexeril to Skelaxin.[12] They discussed the possibility of trying Lyrica[13] for Everson's chronic fatigue but decided against it because of financial reasons. AR 377. Dr. Seeman stated "I think Skelaxin is all he is going to need and I think he can continue working at full pace." *Id.* Everson's last visit with Dr. Seeman was in September, 2008. AR 378. He reported 80% improvement after physical therapy. Everson reported that he had been fired from his job, however and believed that was part of the reason for his lack of pain. *Id.* Dr. Seeman agreed and recommended that a job that did not require standing would be more appropriate for Everson. *Id.*

### 6. Griffith Family Chiropractic Center, 6/08-12/08

Everson's first visit to the Griffith Family Chiropractic Clinic was on June 25, 2008. AR 380. He was not working at the time. He reported neck and upper back pain from an automobile accident. The symptoms Everson reported were headaches, buzzing and ringing in the ears, difficulty sleeping, irritability, tension, neck pain and stiffness, arm and shoulder pain, numbness in the hands and fingers, back pain and spasms, and back stiffness. AR 384. On his initial visit, the chiropractor noted a decreased range of motion and cervical dysfunction. AR 393. The

---

[12]Skelaxin is a muscle relaxant that is indicated for the relief of acute painful musculoskeletal conditions. www.rxlist.com

[13]Lyrica is indicated for several conditions, including fibromyalgia. www.rxlist.com

recommended treatment was spinal adjustments for fourteen weeks and a home exercise plan. *Id.* Everson continued to treat at the Griffith Chiropractic Center until December, 2008. The remainder of the records from this provider, however, are relatively unenlightening. AR 387-410.

### 7. The Foot Center, (Dr. William Eng) 4/09-9/09

Everson visited the Foot Center on May 18, 2009. He reported sharp and aching pains in his left heel after stepping in a hole in the yard of his apartment. AR 441. X-rays revealed increased sclerosis and osteophytic lipping to the periphery of the bone to plantar aspect of the left calcaneal tuberosity, and mild increase in bone density. AR 442. There was no fracture or dislocation. The scan also showed hypertrophic bone spurring and hammertoes. *Id.*

Dr. Eng advised Everson to ice the heel, wear different shoes, and to undertake a home exercise (stretching) program. AR 443. Everson was advised to return in two weeks and then again in nine weeks. Dr. Eng advised that an injection of the tendon would be a possible future treatment plan. [14] Everson returned to Dr. Eng on June 1, 2009. AR 455. He reported a continuing pain level of the left heel of 7/10. Dr. Eng observed an abnormal gait and difficulty walking. *Id.* Dr. Eng's assessment was: plantar fascitis, painful foot, inflammation, hypertension, and difficulty walking. He recommended orthotic inserts for Everson's shoe, foot soaks, stretching exercises, and a change in the type of shoes Everson was wearing. AR 456. Dr. Eng dispensed orthotics during the office visit. Additionally, Everson agreed to obtain appropriate footwear. *Id.*

Everson's next visit to Dr. Eng was on July 3, 2009. AR 457. He reported that a move to a different apartment with more stairs exacerbated his heel pain and also caused his right knee to hurt. He rated his pain level at 8/10. Dr. Eng again observed an abnormal gait and difficulty walking. His assessment remained the same. AR 458. Dr. Eng again recommended different shoes. Additionally, Dr. Eng prescribed a Medrol Dosepak and advised Everson to return in nine weeks.

---

[14]Dr. Eng completed an "initial disability claim form" (AR 445-447) which indicated Everson's next appointment date was June 1, 2009. The form was apparently for the purpose of collecting AFLAC benefits.

*Id.* Everson returned on July 31, 2009. AR 459. He complained of sore toes after dropping a frying pan on his foot and continued heel pain. Dr. Eng observed pain with range of motion and mildly reduced strength in the left foot secondary to guarding. AR 460. There was no visible deformity, laceration or apparent dislocation. Dr. Eng advised Everson to ice the toes and again advised him to obtain different shoes. He recommended Tylenol for pain.

Dr. Eng obtained x-rays of Everson's left foot on September 11, 2009. The x-rays revealed increased sclerosis and osteophytic lipping to the periphery of the bone to plantar aspect of the left calcaneal tuberosity. It also revealed hypertrophic bone spurring and hammertoe deformities. AR 462. This is the last record from the Foot Center.

### 10. Cross Over Health Center[15] 8/09-1/10

Everson first presented at the Cross Over Center on August 4, 2009. AR 479. He complained of chronic fatigue syndrome. The next note from Cross Over Health Center is a rheumatology note dated September 29, 2009. It is handwritten and difficult to read. AR 466. It appears Everson presented with complaints of chronic pain and fatigue. Everson returned to Cross Over on October 27. AR 465, 477. He complained of weakness in the knees, vertigo and neck spasms. He planned to move to South Dakota within a few weeks. *Id.*[16] In November, 2009 Everson presented at Cross Over with concerns of dizziness and ringing in the ears. AR 476. He described becoming dizzy when he stood for long periods of time during his work as a barber. An MRI of the head was negative. *Id.* He was prescribed Celexa[17] in December, 2009. At that time, he was treated for a mood disorder (AR 474). He complained of chronic fatigue, depression and

---

[15]The Cross Over Health Center is "Virginia's largest free health care clinic, providing services to more than 6300 patients yearly. Because most of these patients are the working poor, they often have to choose between food, shelter, and health insurance. And because of Virginia's strict guidelines, they cannot qualify for Medicaid." Www.crossoverministry.org

[16]Everson eventually moved back to South Dakota in April, 2010. AR 65.

[17]Celexa is a selective serotonin reuptake inhibitor. It is indicated for the treatment of depression. www.rxlist.com

memory problems. He reported he was then taking Xanax three times daily. He also reported that he had sleep apnea and was planning to follow up regarding his need for a CPAP machine. *Id.*

The next note in the Cross Over records is dated January 7, 2010. AR 473. Everson complained of vertigo and "ears ringing constantly." Again the handwritten record is difficult to read but it is apparent that Everson continued to express concerns about fatigue, anxiety, and episodes of vertigo. *Id.* The final record from Cross Over is dated January 19, 2010. Unfortunately the handwritten note is not legible. AR 472.

### 11.    Bon Secours Sleep Disorder Center, 11/09-1/10

Everson reported to the Sleep Disorder Center on November 9, 2009. AR 470-471. He was advised to return for a trial of positive airway pressure therapy. He engaged in an overnight sleep study. AR 471. The interpretation was "severe obstructive sleep apnea." Everson returned in January 2010 for an overnight sleep study with the CPAP machine. AR 467-469. Dr. Sautos determined Everson should use a CPAP machine for his obstructive sleep apnea.

### 12.    Sanford Behavioral Health (Dr. Rhonda Smith, Psychologist) 4/10-6/10

Everson reported to Sanford Behavioral Health on a referral from Dr. DeHaan. AR 488. He told Dr. Smith he'd been anxious for 25 years. He indicated that in the past he'd had daily episodes of panic and tachycardia. *Id.* He moved back to Sioux Falls because he grew up here. He reported having been taking Xanax for many years but wanting to try something else because he did not believe the Xanax was working anymore. He'd tried Ativan[18] for a little over a year but thought it made him depressed. *Id.* Xanax was effective but made him not want to get out of bed. He'd been advised to wean himself off Xanax but remained on a low dose. At the time of his first visit to Sanford, he had been living with his parents in Iowa for six months. *Id.*

---

[18]Ativan is an anti-anxiety agent. It is indicated for the management of anxiety disorders or for the short-term relief of symptoms of anxiety or anxiety associated with depressive symptoms. www.rxlist.com

Everson reported he'd been diagnosed with chronic fatigue and fibromyalgia. AR 488. He also reported lower leg and foot pain. He indicated he had fallen while he had scissors in his hands. He explained he'd been diagnosed with vertigo and panic attacks at the VA Hospital in Minneapolis. He also described feeling claustrophobic. AR 488. Everson also described his rear-end accidents and his use of Flexeril in the past, which he indicated made him feel dizzy. He complained that sometimes the prescribed medications made him feel unable to work for two or three days. *Id.* He believed cutting hair was the wrong profession for him because as he got older his health issues made it very stressful for him. AR 489. He felt depressed and like "crap." *Id.*

He reported that he was diagnosed with chronic fatigue in 1993, and the symptoms get worse when he is under stress. *Id.* At the time of his visit, he was trying to work part-time at Great Clips but was calling in sick frequently. He was depressed because he could not support himself. He'd been unemployed for a year and a half. He'd been to the VA and a free clinic looking for help. Celexa and other medications caused him to have side effects such as thoughts of harming someone and increased anxiety. *Id.* He took Flexeril only as needed because it made him feel drugged. Dr. Smith discussed Everson's need to be on a CPAP machine. AR 490. Everson continued to experience tinnitus. *Id.* After evaluation, Dr. Smith's diagnoses were: generalized anxiety disorder, psychosocial stressors, moderate to severe and GAF 60-65.[19]

Dr. Smith noted Everson did not want psychotherapy but did want medication. AR 490. Dr. Smith referred Everson to a physician for further help with medication management. *Id.* Everson called the clinic on April 30 feeling "overwhelmed" He was referred to Avera Behavioral Health.

_____

[19]GAF stands for Global Assessment of Functioning. A rating of 60-65 indicates "**some mild symptoms** (e.g. depressed mood and mild insomnia) **OR some difficulty in social, occupational or school functioning**(e.g. occasional truancy in or theft within the household) but generally functioning pretty well, has some meaningful personal relationships. Diagnostic and Statistical Manual of Mental Disorders, at p. 32 (4th Ed. 1994) (emphasis in original). A more specialized version of the GAF, developed by a division of the Department of Veteran's Affairs (MIRECC) specifically identifies the effect of the scores upon a patient's ability to work. A GAF score of 60 indicates a person who misses work fairly frequently and is inconsistently able to attend to child care, and misses school frequently. *See* www.desertpacific.mirecc.va.gov./gaf

Everson returned to Sanford Behavioral Health for his psychiatric evaluation and medication management on May 18, 2010. He reported he'd moved to Sioux Falls from Virginia about a month ago. AR 482. He reported he'd been diagnosed with chronic fatigue when his father died in 1993 and had been taking Xanax for panic attacks since 1985. He reported he'd suffered whiplash as a result of two rear-end car accidents and had not been able to work as a result of those injuries in addition to his chronic fatigue and fibromyalgia. *Id.* He was depressed and sleep deprived. He had trouble focusing and concentrating. He felt he had "brain fog" because of his chronic fatigue. He described suicidal thoughts, panic attacks and irritability. His primary physician was Doug Dehaan. AR 483. He reported physical problems of whiplash injury, chronic fatigue, sleep apnea, fibromyalgia, plantar fascitis, vertigo, and bilateral tinnitus and knee pain. AR 483. He reported emotional issues as: panic and anxiety, racing heart, uncontrollable crying, energy loss, exhaustion, confusion, loss of reading comprehension, inability to think clearly, sleep disruption and insomnia. He reported he could not afford a CPAP machine. AR 483.

After evaluation, the practitioner's diagnoses were: major depression, generalized anxiety with panic features, rule out panic disorder with agoraphobia, overuse of Xanax, rule out malingering, pain disorder secondary to whiplash injuries, chronic fatigue, sleep apnea, fibromyalgia, plantar fascitis, tinnitus, vertigo, leg and knee pain, lactose and tomato intolerance, severe reaction to Prozac. She estimated his current GAF at 50-55.[20] AR 484. Everson's treatment plan was a trial of Pristiq[21] and to continue with Xanax. AR 485. When Everson returned on June 22, 2010, he indicated he would not be returning to Sanford for psychiatry services because there was a

---

[20]A GAF of 50-55 indicates "**moderate symptoms** (e.g. flat affect and circumstantial speech, occasional panic attacks)) **OR moderate difficulty in social, occupational or school functioning**(e.g. few friends, conflicts with peers or co-workers) Diagnostic and Statistical Manual of Mental Disorders, at p. 32 (4th Ed. 1994) (emphasis in original). The MIRREC GAF score of 55 indicates a person who misses work fairly frequently and is inconsistently able to attend to child care, and misses school frequently. *See* www.desertpacific.mirecc.va.gov./gaf

[21]Pristiq is a serotonin and norepinephrine reuptake inhibitor ( an anti-depressant) indicated for treatment of major depressive disorder. www.rxlist.com

psychiatrist available at the free clinic. AR 481. He reported terrible side effects (dry mouth, insomnia, rapid heart rate, nausea, light-headedness, dizziness, headaches, lack of energy) from the Pristiq. The clinician discontinued the Pristiq. The clinician advised about $4.00 prescriptions available at Wal-Mart. *Id.* A trial of Buspar[22] was recommended. The clinician noted Everson was applying for financial assistance with Sanford. AR 481.

### 13.    Avera Behavioral Health 10/10

Everson was evaluated at Avera Behavioral Health at the suggestion of the physicians at the free clinic. AR 505. He reported increased anxiety, appetite and weight gain and decreased sleep. He also reported decreased concentration and memory. He indicated he "did not know what he would do" if his disability claim was denied. He was concerned about suicidal thoughts if his claim was denied again; his hearing was scheduled for the following Monday. AR 506. An inpatient admission was recommended, but declined by Everson. *Id.*

### 14.  Avera Health Systems (Dr. Nathan Miller) 6/10-10/10

Everson presented to Dr. Miller (internal medicine) at Avera Health for the first time on June 15, 2010. AR 502. He complained of knee pain, chronic fatigue syndrome, and fibromyalgia. Dr. Miller recommended Aleve and requested Dr. Dehaan's records. He asked Everson to return in two weeks. *Id.* Everson returned on June 29. AR 501. He reported knee pain and significant depression. He had discontinued Pristiq a week earlier because it caused homicidal thoughts. Dr. Miller started him on a trial of Bupropion[23] and scheduled a consult with another physician. AR 501. On July 27, 2010 Everson returned and reported the Bupropion caused increased anxiety. AR 499. He continued to complain of knee pain. Dr. Miller's impression was depression that was refractory to a number of medications. *Id.* Regarding the knee pain, Dr. Miller suspected patellofemoral syndrome with a component of osteoarthritis. AR 498. Dr. Miller suspected tension was causing

---

[22]Buspar is an anti-anxiety agent that is indicated for the management of anxiety disorders or the short-term relief of the symptoms of anxiety. www.rxlist.com

[23]Bupropion is a generic name for Wellbutrin. It is an anti-depressant indicated for the treatment of major depressive disorder. www.rxlist.com

Everson's headaches. When Everson returned on August 26, he reported he'd been seen by the orthopedic department. *Id.* Everson was scheduled for a consult regarding his depression in September, 2010. AR 497.

Everson returned to Avera in September, 2010 for treatment of his depression and anxiety. AR 496. The doctor noted that Everson was "focused on getting SSI." AR 495. He decided to start a trial of Mirtazapine.[24] Everson returned for a follow-up on September 28, 2010. Everson reiterated that if he was not successful with his disability claim he "may not be here." *Id.* The physician noted depressed mood and affect congruent with major depressive disorder. *Id.* Dr. Miller encouraged Everson to stay on the Mirtazapine and noted concern about Everson's depressive state. AR 494. He advised a return visit before the Social Security hearing. *Id.* Everson called the clinic on October 12, 2010 and told Dr. Miller's staff he'd discontinued his Mirtazapine because of increased side effects (dry mouth, racing heart AR 495). AR 494.

## 14.    Marriage and Family Therapy Clinic 9/10

Everson visited the Marriage and Family Therapy Clinic in September, 2010. AR 344-345. He presented with depression. He reported he'd tried many different anti-depressants. He indicated he stayed in bed all day and was very isolated. AR 344. He'd been referred to counseling by his physician because he'd reported thoughts of harming himself. *Id.* He reiterated to the counselor that if his "benefits or disability do not come through he doesn't know what he will do." AR 345. The therapist diagnosed major depressive disorder and fibromyalgia. And assigned a GAF of 41.[25]

---

[24]Mirtazapine is the generic term for Remeron. It is an anti-depressant indicated for the treatment of major depressive disorder. www.rxlist.com

[25]A GAF of 41 indicates "**severe symptoms** (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR **any serious impairment in social , occupational or school functioning** (e.g. no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders, at p. 32 (4th Ed. 1994) (emphasis in original). The MIRREC GAF score of 41 indicates a person who can work intermittently in a sheltered work environment, has some difficulty sustaining a coherent conversation, and has impairment in reality testing or communication (delusions, intrusive hallucinations, speech at time illogical, irrelevant, obscure). *See* www.desertpacific.mirecc.va.gov./gaf

The therapist also noted Everson had relational problems and personal worth issues because he could not support himself. AR 345. There is only a record of one visit to this therapist.

### 15. Disability Determination (non-treating, non-examining physician) 6/09

In June, 2009 Everson's claim was denied initially. The denial was based in part on a review of his file by a physician named A. Martin Cader who, according to the specialty code on the form completed by him (AR 94), specializes in pediatrics.[26] Cader reviewed chiropractic records from Dr. Tauer, Capital Chiropractic and Dr. Purvis, medical records from Commonwealth Internal Medicine, and the Foot Center, Everson's adult function report and pain questionnaire, and a third party report. Cader determined Everson did not have a combination of impairments that was severe. AR 90. It appears someone named David Niemeier conducted a Psychiatric Review Technique. AR 91. Niemeier's qualifications do not appear in the record. He determined Everson had no restrictions on activities of daily living, no difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation, each of extended duration (the "B" criteria). He also determined the evidenced did not establish the presence of the "C" criteria. AR 91.

The evaluation concluded by stating that "the evidence shows that you do have occasional joint pain. However, you are able to stand, walk and move about within normal limits. Though you have anxiety, records show that you are able to follow directions, get along with others and act in your own best interest." AR 93.

### 16. Disability Determination (non-treating, non-examining physician) 11/09

In November, 2009 Everson's claim was denied on reconsideration. The denial was based in part on a review of his file by a physician named Juan Astruc who, according to the specialty code on the form completed by him (AR 103), specializes in neurology. Astruc reviewed chiropractic

---

[26]Box 32B on the form requires the physician providing information to indicate a "specialty code." The specialty code on the form indicates specialty number 32, which is pediatrics. *See* https://secure.ssa.gov/poms.nsf/lnx/0426510090

records from Dr. Tauer, Capital Chiropractic, Griffith Chiropractic, and Dr. Purvis, medical records from Commonwealth Internal Medicine, and the Foot Center, Everson's adult function report and pain questionnaire, and a third party report. Astruc determined Everson had the following medically determinable impairments: disorders of the muscle, ligament and fascia, hyptertension, and anxiety. AR 109. He did not classify any of Everson's impairments as severe. *Id.* Astruc also determined Everson did not have a combination of impairments that was severe. AR 109. He indicated "[Everson] continues with pain. Review of MER shows increased pain with ROM, strength normal and he is exhibiting difficulty walking. Based on the evidence in file, allegations are seen as partially credible and clmt should be capable of LIGHT work." AR 108. It appears someone named Donald Bruce, PhD conducted a Psychiatric Review Technique. AR 109. He determined Everson had no restrictions on activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation, each of extended duration (the "B" criteria). He also determined the evidence did not establish the presence of the "C" criteria. AR 109.

The evaluation concluded with the following statement: "the evidence shows that you do have occasional joint pain. However, you are able to stand, walk, and move about within normal limits. Though you have anxiety, records show that you are able to follow directions, get along with others and act in your own interest." AR 110.

**Hearing Testimony**

Everson's administrative hearing was held on October 25, 2010. Everson and a vocational expert (Frank Sazalaska) testified. The hearing was conducted by video conference, with the administrative law judge (ALJ) Marsha Stroup in Denver, Colorado and Everson and his representative in Sioux Falls, South Dakota. AR 56. The vocational expert testified by telephone. *Id.*

Everson was fifty-three years old at the time of the hearing. AR 58. He graduated from high school and attended two years of college. He went to barber's school and was a barber for twenty-

16

nine years. He was involved in a motor vehicle accident in February, 2008 and did not work again until November of that year. AR 59. He worked part-time until January, 2009.

Everson is divorced and has one child. Everson sees his son twice a month. Everson can drive but if he drives too fast it causes him to have vertigo. AR 60. He lives in a government subsidized apartment and receives food stamps. He is 5'11" and weighs 225 pounds. He's gained about forty pounds since his car accident. He was also involved in a car accident about a year before the February, 2008 accident. AR 61. Both were rear-end collisions. Everson explained he has neck, low back and sciatica problems. *Id.* After both accidents he went to chiropractors. After the second accident, however, he was forced to quit treating because he did not have health insurance. AR 62.

Everson also saw his medical doctor and went through physical therapy. AR 62. He was on Flexeril for a while for muscle spasms in his back. *Id.* He continues to have chronic pain in his neck and back every day, some worse than others. AR 62-63. He does not function well under stress and has had chronic fatigue syndrome since 1993. AR 63. He went through two bankruptcies eight years apart because he's mostly worked part-time. *Id.* He believes his chronic fatigue syndrome cost him his marriage. He takes Aleve for pain because he thinks it works as well as the prescription (Tramadol) that he was given. He estimated that he gets debilitating headaches two or three times a week. AR 64.

Everson defined a "good" day as when he can perform household chores such as doing the dishes and washing clothes. AR 64. He estimated he has two or three good days per week, depending on his activity level. AR 65. On a "bad" day he does not get out of bed. AR 76. On an average day, his pain level is 6/10.

Social Services assisted him in finding subsidized housing and obtaining food stamps. AR 65-66. His doctor in Sioux Falls is Dr. Dehaan. He sees a psychiatrist at the free clinic. AR 66. He never did get a CPAP machine but he got a mouth piece that opens his jaw and helps him breathe easier. AR 67. He has difficulty moving his neck and looking in a downward fashion. AR 67.

Sometimes his upper back gets numb and his hands shake. *Id.* He does try to walk a half mile every other day. AR 67-68. He sits down for a half hour, then he walks two blocks home. AR 76. He feels pretty good but when he gets home and sits down for a while, he feels like an 80 year old man. AR 68. He carries a cane when he goes walking because sometimes his leg buckles. *Id.* Sometimes he goes for days without showering because he is nervous about falling in the shower. AR 68. In four months he'd only vacuumed his apartment once. AR 69. He does grocery shop but he does not buy much at a time because he has a hard time carrying the groceries up the stairs. *Id.*

Everson testified when his son comes to visit they usually watch movies and play video games. He takes his son to the park but cannot do much with him there. AR 70. He explained he cannot drive his car very fast or he gets vertigo. AR 71. He also explained he gets vertigo if he stands too long. He actually fell into customers with scissors in his hands a few times AR 71. Sometime he gets vertigo while reading. *Id.* The doctors took an MRI of his head to try to figure out why he gets vertigo but they could not find anything. *Id.*

Everson described himself as formerly an extrovert, but because of his physical problems he's become "basically a hermit." AR 72. He watches television and checks out movies from the library. If he watches too much television, however, he gets headaches. *Id.* When he gets a headache he lies down for two or three hours and puts a cold compress on his forehead. AR 74-75. He believes the stress of being financially dependent on his elderly mother has made his stress and depression worse. AR 73.

Everson described his anxiety symptoms as follows: "I feel like I'm having a heart attack, and I can't breathe. It's hard for me to breathe. I feel like I'm going to faint. That's why I don't –If I –I don't like being around crowds. If I'm in a crowd, I'll stay toward the aisle. I won't go sit in the middle because I need a place where I need to get out of there in a hurry." AR 78. He also described a "fogginess" in his head that he ascribed to his chronic fatigue syndrome. *Id.* He estimated he could stand for one half hour before having to sit down. AR 79. He estimated the most he could lift was ten pounds, but that would cause muscle spasms in his back later. *Id.*

**Vocational Testimony**

Frank Sazalaska is a rehabilitation consultant certified by the Minnesota Department of Labor. AR 80. The ALJ posed the following restrictions to the VE: light work but not constant, no constant neck motion looking up and down or right and left constantly and no static neck motion with bending for an hour or two at a time and not moving the head much; in other words normal neck flection during the day. Occasional overhead, occasional push/pull. Limited to unskilled work. Given those restrictions, the VE opined Everson could not return to his past relevant work.

The VE opined, however, that Everson could be able to perform the work of a gate guard, DOT 327.667-030. That job is semi-skilled. He also opined Everson could perform the work of a greeter or hostess, DOT code 352.667-010. That is also a semi-skilled job. The VE also opined Everson could perform the job of cashier, DOT code 211.462-101 which is unskilled. The VE stated that for each of those positions, employers would tolerate two or less days absent per month. AR 82. A need to leave work early because of pain, vertigo, or anxiety would be considered an unexcused absence. *Id.* Additionally, very few unscheduled breaks are allowed in unskilled work settings. *Id.* The same is true for being off-task at an unskilled job. AR 83.

**Third Party Evidence**

The record contains a "Function Report-Adult Third Party" which was completed by Everson's ex-wife. AR 203-303. She indicated she regularly spends time with Everson. AR 293. She described him as very inactive. AR 294. She described his physical condition as having affected his grooming habits and his ability to handle stressful situations. AR 295. She avoids discussing upsetting topics because "it takes him a few days to recover." *Id.* She said "he seems to be suffering with something." *Id.* She explained that he wears his clothes several times before washing them and does not iron or do anything that requires exertion. AR 296. She described him "being in a comatose state just sitting for several days because he wasn't feeling well, saying that he ached." AR 297. She explained he does not socialize or attend school events or programs. AR 299. She also believed he was not very attentive. AR 300. She described him as becoming easily frustrated

and "somewhat unapproachable" when his symptoms become overwhelming. AR 301. When he becomes too depressed, she keeps the kids home; "I don't ask him for much emotionally." *Id.* In the section provided for additional remarks, Ms. Everson explained that her ex-husband "has a hard time recovering from things that are considered normal every day stress." AR 302. She attributed this to his long-time chronic fatigue. She concluded by stating she'd seen his health decline physically and emotionally over the years. *Id.*

## DISCUSSION

### A. Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) . Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Klug v. Weinberger*, 514 F.2d 423, 425 (8th Cir. 1975). "This review is more than a rubber stamp for the [Commissioner's] decision, and is more than a search for the existence of substantial evidence supporting his decision." *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989) (citations omitted). In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. *Woolf*, 3 F.3d at 1213. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. *Id.* If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. *Oberst v. Shalala*, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. " *Mittlestedt v. Apfel*, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

Additionally, when the Appeals Council has considered new and material evidence and declined review, the Court must decide whether the ALJ's decision is supported by substantial evidence in the whole record, including the new evidence. *O'Donnell v. Barnhart*, 318 F.3d 811,

816 (8th Cir. 2003).

The court must also review the decision by the ALJ to determine if an error of law has been committed. *Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. *Walker v. Apfel*, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. *Smith*, 982 F.2d at 311.

### B. The Disability Determination and The Five Step Procedure

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511. The ALJ applies a five step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. *Smith v. Shalala*, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. When a determination that an applicant is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary. *Bartlett v. Heckler*, 777 F.2d 1318, 1319 (8th Cir. 1985). The five steps are as follows:

**Step One:** Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 404.1520a. This special procedure includes

completion of a Psychiatric Review Technique Form (PRTF).

**Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. *Bartlett v. Heckler*, 777 F.2d 1318, 1320 at n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. *Heckler v. Campbell,* 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 404.1520a(c)(2).

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW) as defined by 20 CFR 404.1560(b)(1). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

## C. Burden of Proof

The Plaintiff bears the burden of proof at Steps One through Four of the Five Step Inquiry. *Barrett v. Shalala*, 38 F.3d 1019, 1024 (8th Cir. 1994); *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000); 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at Step Five. "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting at Step Five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).

**D.    The ALJ's Decision**

The ALJ issued a ten page, single-spaced decision on November 22, 2010. The ALJ's decision discussed steps one through five of the above five-step procedure.

At step one, the ALJ found Everson had not engaged in substantial gainful activity since his alleged onset date (February 13, 2008). AR 29.

At step two, the ALJ found Everson has the following severe impairments: neck and low back pain and anxiety. AR 29. The ALJ discussed Everson's cervical degenerative spondylosis and mechanical cervical pain related to his motor vehicle accidents. *Id.* She also acknowledged his lumbar disc disease with associated low back pain. *Id.* The ALJ specifically "accept[ed] and acknowledge[d] that they are severe as they more than minimally interfere with his ability to engage in basic work activities." AR 29-30.

The ALJ acknowledged "issues with fibromyalgia" which she indicated were considered in establishing the residual functional capacity. AR 30. It is not clear whether she considered fibromyalgia a severe impairment. She also acknowledged Everson suffered major depression but indicated "the evidence does not support a conclusion that the claimant has any mental issues, other that (sic) the above-referenced anxiety, more than mildly interfering with his ability to engage in basic mental work activities. Moreover, any latent affective-related limitations do not reduce the mental functioning beyond that allowed for in the mental residual functional capacity as established at finding 5 below." AR 30. She also found that Everson's vertigo/dizziness did not interfere with his ability to work "more than minimally." AR 30. The ALJ rejected as unsupported Everson's claim that headaches or any other medical necessity required him to need to lie down for several hours at a time three or four times a week. *Id.* Finally, the ALJ acknowledged that Everson suffers from sleep apnea but declined to assign any work related limitation as a result of the condition. "Moreover, any latent limitation the claimant might experience due to apnea-related issues would be accommodated by the residual functional capacity as established at finding 5 below." *Id.*

At step three, the ALJ indicated she considered whether Everson is disabled under Listings 12.04 (Affective Disorders) and 12.06(Anxiety Related Disorders). The ALJ found, however

> The claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06. In making this finding, the undersigned has considered whether the 'paragraph B' criteria are satisfied. To satisfy the 'paragraph B' criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living, marked activities in maintaining concentration, persistence or pace, or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation , each of extended duration, means three episodes within one year, or an average of once every 4 months, each lasting for at least 2 weeks.

> As discussed in greater detail at finding 5 below, the claimant is no more than moderately limited in any area of basic mental functioning. In activities of daily living, the claimant has mild restriction. In social functioning, the claimant has mild difficulties. With regard to concentration, persistence or pace, the claimant has moderate difficulties. As for episodes of decompensation, the claimant has experienced no episodes of decompensation which have been of extended duration. As such, the ALJ found that Everson does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Supbart P, Appendix 1. *Id.*

> The limitations identified in the 'paragraph B' criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listings Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis.

*See* AR 31.

At step four, the ALJ found Everson has the residual functional capacity (RFC) to perform light work, except that "the claimant can engage in frequent, but not constant hand work. The claimant should engage in no constant neck motion. The claimant also cannot withstand static neck positioning involving not moving his head much for an hour or two. The claimant is able to engage in occasional overhead push/pull activities. The claimant is also limited to mentally unskilled work."

24

AR 31.

The ALJ explained that in making the RFC determination, she considered Everson's symptoms to the extent reasonably consistent with the objective evidence based on the requirements of 20 CFR 404.1529. She also considered the opinion evidence in accordance with 20 CFR 404.1527. AR 31. She explained that she had considered Everson's credibility in determining the RFC. AR 32. She considered Everson's testimony and the third party statement submitted by Everson's ex-wife. *Id.* The ALJ found his medically determinable impairments could reasonably be expected to cause his alleged symptoms, "however the claimant's statements regarding the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." AR 32. The ALJ cited the lack of damage to Everson's vehicle from the rear end crash. She also cited the chiropractic records which she believed did not support the severity of his claims. AR 33. She cited his ability to engage in light weight lifting and to use his Gazelle for thirty minutes at a time as "fundamentally consistent with an ability to engage in light work activities." *Id.* The ALJ also referred to Everson's apparent AFLAC claim, made in May 2009 as inconsistent with his Social Security claim.[27] The ALJ specifically noted Dr. McLeod's hesitancy to conclude, in August of 2009, that Everson was totally disabled. AR 33. The ALJ acknowledged Everson had been taking Xanax for many years but concluded Everson was "doing fine with this with a little agoraphobia and some car sickness . . ." AR 33. She concluded, however, that "the undersigned is satisfied that subsequent to the alleged onset date the claimant's mental condition has precluded all but unskilled work." AR 34.

The ALJ acknowledged Everson's mental health providers had assigned GAF scores ranging from 41-65 during the relevant time period. AR 34. She concluded, however, that "the scores typically are consistent with a conclusion of no greater than a moderate degree of limitation." She

---

[27]Specifically, in May 2009 Everson filed for AFLAC benefits alleging an initial disability date of April 17, 2009 after stepping in a hole in his yard. AR 443-446. On the claim form, Everson indicated he'd been working between thirty and forty hours per week before the incident.

also opined that, other than threatening to harm himself if his disability claim was denied, the record did not contain any reference to Everson having been a particular danger to himself. *Id.* The ALJ concluded: "As for the opinion evidence, the record is fundamentally devoid of any particular opinion supportive of a proposition that the claimant would be unable to engage in activities consistent with the residual functional capacity as established." *Id.*

After determining Everson's residual functional capacity (RFC), the ALJ determined that Everson was not capable of returning to his past relevant work as a barber. AR 34. The ALJ determined, however, that Everson was capable of performing other jobs which exist in the national economy. Specifically, the ALJ determined that Everson's RFC, combined with his age, education and work experience did not preclude him from performing the job duties required to return to work as a cashier, gate guard, or greeter. AR 35. As such, the ALJ found Everson is not disabled.

### E.     The Parties' Positions

Everson assigns three points of error: (1) the Commissioner failed to identify and evaluate all of Everson's severe impairments [28] (2) The Commissioner's determination of Everson's RFC is not supported by substantial evidence on the record as a whole; (3) the Commissioner relied on vocational evidence that is not supported by substantial evidence.[29] The Commissioner asserts her decision is supported by substantial evidence on the record and should be affirmed.

### F.     Analysis

Everson asserts the Commissioner made three mistakes:  (1)She failed to identify and evaluate all of Everson's severe impairments ; (2) Her determination of Everson's RFC is not supported by substantial evidence on the record as a whole; and (3) She relied on vocational evidence that is not supported by substantial evidence. These assertions will be examined in turn.

---

[28]This argument contains sub-parts.

[29]This argument also contains sub-parts.

1. **The Commissioner's Failure to Identify and Evaluate All of Everson's Severe Impairments**

Everson's first assignment of error contains several sub-parts. First, he asserts the ALJ failed to identify all of his medically determinable impairments and clearly identify their severity. Specifically, Everson asserts the ALJ failed to identify all his severe impairments. A claimant's impairments are severe unless they are only slight and have no more than a minimal impact on his ability to perform basic work activity. *Ngyen v. Chater*, 75 F.3d 429, 430-431 (8ᵗʰ Cir. 1996). The ALJ specifically acknowledged as Everson's severe impairments the following: neck and low back pain and anxiety.

The ALJ acknowledged as "issues" but did not clearly identify as medically determinable impairments the following: fibromyalgia/chronic fatigue syndrome, depression, sleep apnea, vertigo, and headaches. The ALJ did not indicate whether, if she did consider those conditions as medically determinable impairments, she considered them severe.

An "arguable deficiency in opinion-writing technique" does not require reversal of an ALJ's otherwise substantially supported decision. *Hepp v. Astrue*, 511 F.3d 798, 806 (8ᵗʰ Cir. 2008). On the other hand, it is reasonable to require that an ALJ's decision be sufficiently articulated. *Spicer v. Barnhart* 64 Fed. Appx. 173 (10ᵗʰ Cir. 2003). Reviewing courts should not be left to speculate what evidence led the ALJ to his or her conclusions. *Kepler v. Chater*, 68 F.3d 387, 391 (10ᵗʰ Cir. 1995).

In her written decision, the ALJ acknowledged Everson had "issues" with fibromyalgia/chronic fatigue, depression, vertigo, headaches, sleep apnea, and chronic anxiety. AR 30. She explicitly accepted anxiety as a severe impairment. In her discussion of the other issues, however, it is not entirely clear whether the ALJ considered them medically determinable impairments.[30] The ALJ stated she considered fibromyalgia, major depression, and sleep apnea in

---

[30]A medically determinable impairment is one which "results from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable

establishing the RFC. AR 30.[31] A review of the RFC formulation, however, reveals no mention of Everson's fibromyalgia, depression or sleep apnea nor how (or if) these conditions affected the parameters of the RFC.

The pre-amble to ALJ's RFC formulation indicates she "has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . .[and] has also considered the opinion evidence in accordance with the requirements of 20 CFR 404.1527." AR 31. A blanket statement that all the evidence has been considered, however, is not enough to enlighten a reviewing court. "The ALJ is charged with carefully considering all of the relevant evidence and linking [her] findings to specific evidence." *Spicer v. Barnhart* 64 Fed. Appx. 173, 178 (10th Cir. 2003). SSR 98-6 requires the ALJ's narrative explaining her RFC formulation to include, among other things, a section which sets forth a logical explanation of the effects between the claimant's accepted medical impairments and his or her ability to work. *Id.* at *7; *Pimentel v. Astrue*, 2013 WL 93173 (N.D. Ill.) at *6-7. In this case, a clear articulation of (1) the medical impairments which were accepted by the ALJ as sufficiently established by the record; (2) the severity of the accepted medical impairments; and (3) a clear articulation of the link between the impairments and the RFC formulation are all lacking from the

---

clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms and laboratory findings, not only by your statement of symptoms." 20 CFR 404.1508.

[31]Fibromyalgia is "an elusive diagnosis[.]" *Tilley v. Astrue*, 580 F.3d 675, 681 (8th Cir. 2009)."Its cause or causes are unknown, there's no cure, and, of greatest importance to disability law, its symptoms are entirely subjective." *Id.* (citations omitted). The recognized characteristics of fibromyalgia are: chronic widespread aching and stiffness, particularly in the neck, shoulders, back and hips, which is aggravated by the use of the affected muscles. *Id.* The condition has been recognized by the American College of Rheumatology (ACR). Diagnosis is made after eliminating other conditions because there are no confirming diagnostic tests. *Brosnahan v. Barnhart*, 336 F.3d 671, 672, n.1. The ACR standards indicate that fibromyalgia is diagnosed based on widespread pain and tenderness in at least eleven of eighteen sites known as "trigger points." *Id.* When the record indicates the ALJ's findings have been influenced by a fundamental misunderstanding of fibromyalgia, reversal and remand are appropriate. *Garza v. Barnhart*, 397 F.3d 1087, 1089-90 (8th Cir. 2005).

ALJ's written opinion. For these reasons, reversal and remand are required.

Everson likewise notes the ALJ failed to acknowledge his obesity [32] as medically determinable impairment. He asserts this failure infected the outcome of the entire process because *all* impairments, even those that are not severe, must be considered when formulating a Social Security claimant's RFC. The formulation of the RFC has been described as "probably the most important issue" in a Social Security case. *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982) *abrogation on other grounds recognized in Higgins v. Apfel*, 222 F.3d 504 (8th Cir. 2000). "Failure to consider a known impairment in conducting a step-four inquiry is, by itself, grounds for reversal." *Spicer v. Barnhart*, 64 Fed. Appx. 173, 178 (10th Cir. 2003). *See also, Washington v. Shalala*, 37 F.3d 1437, 1439-40 (10th Cir. 1994) ("failure to apply the correct legal standard . . . is grounds for

---

[32]Before October 25, 1999, obesity was a "listed" impairment under Appendix 1, Subpart P, Part 404. After obesity was eliminated from the Listings, the Social Security Administration issued SSR 02-01p to guide ALJs in their evaluation of disability when the claimant is obese. Social Security Ruling 02-01p instructs that "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." *Id. See also Webster v. Commissioner of Social Security*, 2008 WL 207578 (W.D. Mich.) at *4. The ruling does not, however, mandate a particular mode of analysis. *Id.*

The language contained in the Social Security Regulations, however is mandatory. Although Everson did not explicitly cite obesity as a reason for his disability claim, the ALJ was **required** to consider its effect upon his other impairments. Appendix 1, Subpart P, Part 404. Sec. 1.Q. provides:

> Q.    Effects of obesity. Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators *must* consider any additional and cumulative effects of obesity.

reversal. We note that the ALJ failed to consider the Plaintiff's vision loss in conducting the step-four inquiry. This failure, alone, would be grounds for reversal.").

The impairments accepted as severe by the ALJ included neck and back pain. Everson's recorded height–5'11' and weight (ranging from 225 pounds to 244 pounds) in the medical records and from his hearing testimony (AR 60, 426, 430, 432, 434, 450, 472) indicate that Everson is obese.

It is generally recognized that a body mass index of 30 or greater indicates obesity. http://www.nhlbi.nih.gov/guidelines/obesity/BMI/bmicalc.htm. Everson's BMI ranged from 31.5 to 34.0. The Social Security Regulations require the Commissioner to consider Everson's obesity when assessing his claim at all steps of the sequential evaluation process, including when assessing an his residual functional capacity. *See also Reeder v. Apfel*, 214 F.3d 984, 988 (8th Cir. 2000) (reversing and remanding denial of benefits because ALJ ignored record evidence of claimant's obesity and arthritis; ALJ did not explicitly consider combined effect and "the ALJ is not free to ignore medical evidence but rather must consider the whole record."); *Thompson v. Bowen,* 850 F.2d 346, 350 (8th Cir. 1988) ("While obesity is not a per se impairment, on remand, the ALJ should consider Thompson's obesity as an impairment that may affect her disability status.") (citation omitted). The ALJ's failure to consider Everson's obesity throughout the sequential evaluation process constitutes reversible error. For this reason as well, this case should be reversed and remanded for further consideration.

Everson also alleges the ALJ's failure to acknowledge his hearing loss constitutes reversible error. Although Everson cited dizziness as a reason for his disability and has often complained of vertigo, neither his medical records nor his hearing testimony reveal that he has ever complained of significant hearing loss. Everson's hearing loss is documented at AR 420. It shows that on the left, Everson has moderate to severe hearing loss in the 3000 to 8000 hertz range, while on the right, he has mild to moderate hearing loss in that same range. However, normal conversation falls outside the pitch of Everson's hearing loss. *Id.* His audiogram results indicate his word recognition is between 85% and 92% on the left and between 86% and 92% on the right. *Id. See also*

http://www.thehearingcurve.com/hearingcurves_speechbanana.html. Everson has failed to show how a hearing loss at pitches outside the range of normal conversation constitutes an impairment. The ALJ did not err, therefore, by failing to identify Everson's hearing loss as a medically determinable impairment.

### 2. The Commissioner's Determination of Everson's RFC

The RFC as articulated by the ALJ was as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416967(b) except the claimant can engage in frequent, but not constant, hand work. The claimant should engage in no constant neck motion. The claimant also cannot withstand static neck positioning involving not moving his head much for an hour or two. The claimant is able to engage in occasional overhead push/pull activities. The claimant is also mentally limited to unskilled work.

AR at 31. The limitation to light duty work was found in the opinion from the non-examining, non-treating physician who supported the denial of benefits on review (Dr. Astruc). AR 108-110. The ALJ rejected that opinion, because she modified it by adding limitations to the definition of light duty work.

The ALJ's modifications to the definition light duty work are not found in Dr. Astruc's very brief narrative regarding Everson's physical capabilities. AR 108-110. Nor are they found in any of Everson's treating physician's notes. Likewise, Donald Bruce, the PhD who evaluated Everson's mental functioning, indicated Everson had mild difficulties in maintaining social functioning and concentration, persistence or pace, but did not comment upon how these difficulties impacted Everson's ability to perform in the workplace.

In August, 2009, Everson's treating physician (Dr. McLeod) declined to certify Everson was "disabled for life" because he was unsure whether Everson had yet explored all treatment options. The ALJ did not ask Dr. McLeod nor any of Everson's other treating physicians to comment upon other potential treatment options, nor upon how Everson's physical or mental impairments currently affect his ability to function in the workplace. Rather than seek out this information, the ALJ simply

inferred and then inserted her own medical findings. This practice is "forbidden by law." *Pate-Fires v. Astrue*, 564 F.3d 935, 947 (8th Cir. 2009) (citations omitted).

The Eighth Circuit has explained that reliance on the opinion of a non-examining, non-treating physician to determine RFC does not constitute substantial evidence on the record. "The ALJ relied on the opinions of non-treating, non-examining physicians who reviewed the reports of the treating physicians to form an opinion of [claimant's] RFC. In our opinion, this does not satisfy the ALJ's duty to fully and fairly develop the record. The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record." *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). Further, when there is no medical evidence in the record, the ALJ cannot simply make something up. "[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). The ALJ must not "succumb to the temptation to play doctor and make their own independent medical findings." *Pate-Fires v. Astrue*, 564 F.3d 935, 947 (8th Cir. 2009) (citations omitted). An ALJ also "may not draw upon his own inferences from medical reports." *Lund v. Weinberger*, 520 F.2d 782, 785 (8th Cir. 1975).

In this case, the ALJ's RFC is not supported by substantial evidence for two reasons: (1) the "light duty" RFC which was adopted by the ALJ was assigned solely by the non-treating, non-examining physician; and (2) the ALJ compounded the error by adding modifications which were not supported by any record medical evidence whatsoever to the light duty RFC.

Because there was insufficient evidence in the record to determine how Everson's medical impairments affected his ability to function in the work place, the ALJ should have sought such an opinion from Everson's treating physicians. At the very least, the ALJ should have ordered a consultative examination, including psychiatric and/or psychological evaluations to assess Everson's mental and physical residual functional capacity. " *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). Reversal and remand is necessary for a proper formulation of Everson's RFC.

### 3. The Commissioner's Reliance on Vocational Evidence That Was Not Supported By Substantial Evidence

Everson's final assignment of error is that, for various reasons, the vocational evidence relied upon by the ALJ did not have sufficient foundation. Everson asserts that because the vocational evidence was faulty, the ALJ's ultimate conclusion that Everson is not disabled is not supported by substantial evidence.

Because this case will be remanded for reconsideration of Everson's medically determinable impairments and for a proper determination of his RFC, a discussion of this point of error in this Report and Recommendation would be purely academic. Upon remand, the vocational evidence should be re-evaluated after Everson's medically determinable impairments and RFC are clarified.

### CONCLUSION and RECOMMENDATION

For the reasons more fully explained above, it is respectfully recommended that Plaintiff's Motion for Summary Judgment (Doc. 9) be GRANTED, and the the Commissioner's denial of benefits be REVERSED and REMANDED for reconsideration.

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. The Plaintiff requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider his case.

42 U.S.C. § 405(g) governs judicial review of final decisions made by the Commissioner of the Social Security Administration. It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands. A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling. *Buckner v. Apfel*, 213 F.3d 1006, 1010 (8th Cir. 2000). A sentence six remand is authorized in only two situations: (1) where the Commissioner

requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. *Id.* Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." *Buckner*, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. *Id., Cox v. Apfel*, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated. *See also Taylor v. Barnhart*, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability). Therefore, a remand for further administrative proceedings is appropriate. It is respectfully RECOMMENDED to the District Court, therefore, that the Commissioner's decision be REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.

*Thompson v. Nix,* 897 F.2d 356 (8th Cir. 1990).
*Nash v. Black,* 781 F.2d 665 (8th Cir. 1986).

Dated this _3/_ day of July, 2013.

BY THE COURT:

John E. Simko
United States Magistrate Judge

ATTEST:

JOSEPH HAAS, Clerk

By _____, Deputy

35